### *PELUSO & TOUGER, LLP*
#### *70 LAFAYETTE STREET*
#### *NEW YORK, NEW YORK 10013*
**PelusoandTouger.com**

**Ph. No. (212) 608-1234**
**Fax No. (212) 513-1989**

BY ECF:
Honorable Alvin K. Hellerstein
United States District Court Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re: <u>United States v. Jayquan Smith</u>,
         21 CR 280 (AKH)

Your Honor,

A young teenager sits in his childhood bedroom, looking out the window he sees signs of poverty, depression and lack of hope everywhere.  He has no idea where his father is.  He is living with his grandmother, separate from his brother and sister due to the poverty of his family and rarely sees his mother as she works long hours just to put food on the table.  As he looks out of the window the streets are dirty, people walk with their head down just trying to plug through another day and try to make ends meet and put food on the table for their family.  Inside his own stomach are the growls of hunger and the wondering is there going to be enough food for dinner or is he going to have to wait for school tomorrow to eat again. He looks in his room and he sees nothing of value and his closet certainly doesn't have the latest fashions.  He sees his life going nowhere and just recycling the life he now lives in.  If he is lucky, he finds a job that pays him minimum wage and it is only after years of labor that he will ever have any real money to spend.  Then he hears the sound of a car driving through the street, its speakers blasting and he looks out and sees the beautiful fancy car and the driver has expensive sunglasses and the most fashionable clothes, who is it, the local kids who deal drugs.   No one else in the neighborhood has any money or power.  The streets call to him as the only answer to his humdrum and impoverished life.  He hears his mother's voice in the back of his head saying, "no, do not give in to the temptation" but the pull

becomes too hard to resist.  He begins to feel he has no other way out.  His self-esteem has been beaten out of him and so has the hope of a better life.

Just as the pull of the street grows strongest his grandmother dies.   A depression ensues and is compounded by the fact that he now moves back into his mother's overcrowded home. While on one hand happy to be back with his mother the living conditions only add to the depression of losing his grandmother.

This is Jayquan as a teenager, feeling stuck, stagnated, no hope.  As he walks the street near his home drug dealing, violence and other threats surround him.  As an unaffiliated black teenager his life is literally under threat every day. He is having trouble concentrating in school as he sees no hope coming from those classes.  The gangs begin to approach him, offering him money, clothes, food and most of all camaraderie and safety.  He will not be threatened every time he walks somewhere in his neighborhood. He decides to start out small.  Make just a little money to help at home, buy some clothes, a new phone, just a little to make living just that much easier.  But inevitably over time one things leads to another and his life spirals out of control and he ends up a member of the local gang.  He ends up another disillusioned young black man with no male role model, caught up in the life of the streets because he saw no other option. These horrible decisions made by a disillusioned teenager is why Jayquan finds himself before you awaiting sentence on these serious charges.  He felt like he had no choice back then but now he knows he did and he made the wrong decisions.

Of course, within a short time he drops out of school completely and then under arrest before he has even turned 17.  He is arrested on two charges and at 18 years old is sent upstate to Comstock Correctional Facility where he is imprisoned for 32 months.  However, unlike most people his age when sent to prison he does not give into the despair and just continue his life on the street in jail running around with gangs and doing nothing but wasting his time and making plans for rejoining the streets when he gets out.  No Jayquan decides to use his time in jail positively.  To take vocational courses and grow from an angry disillusioned teenager into a twenty-year-old with a plan to go straight upon his release.  Jayquan does a lot of growing during his almost three years in jail.  This takes a lot of soul searching.  He knows he

wants more out of life then just giving in to the streets and spending his life going in and out of jail. He is determined when released to not end up back running the streets.

In July of 2018 he is released from custody and Jayquan immediately tries to make good on the promises he made to himself. At first, he is quite successful he works at various jobs including as a concessionaire at Yankee Stadium, takes certain vocational courses and passes various licensing exams in an effort to get better paying and more meaningful work. He establishes a loving relationship with his now partner, Brianna Richardson, and they have a child, Aston[1]. All was moving in the right direction. However, then Covid hit and he lost his job and was unable to find new employment. Money began to run short, tension built with his girlfriend and flash backs of his young life began to run through his mind. He needed to make some money. So he fell back into the streets once again. Jayquan is certainly not proud of his decision and regrets it terribly more than this Court will ever understand. This horrible decision led him to where he is today, stuck behind bars and with this Court having his future in its hand.

Jayquan however, has not spent his time in jail since his arrest in this matter as an angry, depressed young man just doing his time blaming everyone else for his problems. To the contrary he has used this time to take stock of his life and realize he is not a teenager anymore and if he keeps going the way he was he will just spend his life going in out and out of jail and accomplishing nothing. He has spent his time reading books on how to better his life. He has spent his time taking courses on how to be a better and more productive person[2]. He has done a lot of thinking of where his life was and where it was going and where he now wants it to go. The result of all of that reading, courses and thinking has resulted in a new Jayquan Smith. A Jayquan Smith that has hope and aspirations not one who devoid of both. A Jayquan Smith who is determined to make a better life for himself, one who now thinks success is a real possibility and you do not need criminal activity to get there.

Jayquan wants to be a positive force for himself, his family specifically and society in general! He knows he let life get away from him for a few years. He failed himself and society. But

---

[1] Aston is now 2 years old and has been diagnosed with autism. Jayquan was active in his son's life prior to his incarceration.

[2] The certificates for these courses are attached hereto.

Honorable Alvin K. Hellerstein
January 9, 2023
Page 4 of 21

sometimes life is a cruel teacher it gives us tests before it gives us enough lessons to pass them.  Jayquan now completely understands how he failed this test in his life and he has now learned the lessons enough to pass any test that life puts before him again.  No one, not this Court or anyone else ever has to fear him failing this test again.  He has learned that his decision to rejoin the streets was wrong.  He has learned that you need to surround yourself with the right people, people who want to make the most of their lives, fulfill their potential and work towards making their own lives, the lives of their family and friends and society in general better.  He has learned that there are no quick fixes in life, not for financial problems or any other problems.  The answer to life's problems is more hard work and careful thought not quick fixes and emotional responses.  These lessons have been burned into his very soul never to be forgotten again.

The fact that Jayquan became involved in the charged conspiracy at first look might make some Courts determine that a Guidelines sentence in this matter is necessary.  However, the Guidelines already take into account every negative and aggravating element of this crime.  What the Guidelines do not consider is the background of Jayquan and the actions he has taken since his arrest. Once this Court looks at all the facts of this case and the individuals involved it is a perfect example of why years ago the Supreme Court ruled in *Booker* that the Guidelines should only serve as a beginning point for a Sentencing Court's determination and not an end point.  The facts of this case are not typical. They cannot be reduced to a cold mathematical determination, this case cries out for a Court to go beyond the cold math and use its experience, compassion and thoughtful consideration of all the facets of this case to come to a just sentence.  Because, while it is true that Jayquan became involved in the charged conspiracy and as stated, failed his first test, he will not fail another one.  He has learned his lesson and just wants to be with his family and resume his life, never to commit any crime again.

The Pre-Sentence Report's (PSR) recommendation takes none of these factors into consideration and merely states because of the violent nature of the crime Probation recommends a 204 month jail sentence.  The PSR although noting that the "defendant was raised (as they categorized it) under less fortunate circumstances." Yes not knowing where your next meal is coming from is "less fortunate circumstances".  Probation further noted

Honorable Alvin K. Hellerstein
January 9, 2023
Page 5 of 21

that he was raised in a "predominantly high crime area and violent environment" but Probation although it does recommend a below Guideline sentence, its sentence recommendation is still exorbitantly high and totally ignores the detrimental effect that being raised in such an environment has on a young man.  Probation ignores the voluntary steps Jayquan has already taken towards rehabilitation and the remorse for his actions that he feels.   Probation ignores everything that the Guidelines ignore and just makes a recommendation based on the crime itself.  The defendant implores this Court to not fall prey to this action and the current headlines in our newspapers.  All defendants are not equal and all defendants should receive a sentence that takes into account not just the crime he or she committed but the circumstances in their lives that led up to the crime being committed, their actions since being arrested and their efforts to self-rehabilitate. Punishment for committing serious crimes is not the only goal of sentencing.  Rehabilitation is an equally important goal and this is where Jayquan's past and his current attempts at self-help are most important.  The Guidelines have already considered the facts of the case and arrived at a recommendation but as previously stated a just sentence is one that is not just based on the facts of the case but also takes into consideration the facts and circumstances of the individual defendant, his personal history, his remorse for his actions and the steps he has taken towards rehabilitation already.  Here, Jayquan's personal history is one of great tragedy and abject poverty.  His letter to the Court and the other letters the Court has received demonstrate his remorse and his actions since his arrest demonstrate the steps towards rehabilitation that he has already taken voluntarily.  Thus, the defense respectfully submits that a sentence of seven years is certainly an adequate amount of time to provide punishment and deterrence of future criminal activity in this particular case.

The PSR's recommendation list the aggravating factors as his criminal history and the facts of this case.  Those are not aggravating factors at all.  Those are indeed the only two factors that the Guidelines fully take into consideration.  Those two factors are what drives Jayquan's guideline calculation and why the Courts have held that every sentence calculation should begin at a calculation of a defendant's guideline range, which consists of his criminal history, and the facts of the case.  However, a defendant should not be double punished because of those factors.  That is why the Courts have consistently held since *Booker* that the Guideline

Honorable Alvin K. Hellerstein
January 9, 2023
Page 6 of 21

calculation is only the starting point and a Court must go beyond that and take into consideration all the facets of a defendant's life and then decide what sentence is just and deserved.  Here, Probation has failed to do that in arriving at its determination, it stopped their analysis at Jayquan's record and the facts of the case, current case law and practice does not allow such a limited analysis.  Probation failed to consider such mitigating factors as the person Jayquan is, his actions since his arrest, his upbringing and other factors of the case. None of these factors if truly considered should lead to a Guideline sentence.  Because the Guidelines have already taken into consideration the violent and serious nature of the instant offense and most respectfully once you look at the instant offense specifically the only just conclusion should be that each fact points to a mitigating factor.  Was Jayquan the person who originated the charged conspiracy?  No.  Was Jayquan in charge of or supervise others? No.  Has Jayquan taken major steps at self-rehabilitation? Yes.  Does Jayquan have a plan for the future? Yes.  Yes, it is true that Jayquan not only possessed but fired a gun at individuals as a member of the charged conspiracy.  And, there is no excuse for such violent actions because innocent people could have been hurt but luckily none were.  But this violence was not started by Jayquan nor was it focused against innocent members of the public.  This violence was part of the violence of the streets that Jayquan was raised in.  It is important to note that Jayquan realizes this is no excuse for his actions nor should he not be punished for his actions.  (Seven years is not a short sentence by any standard).  The explanation is only offered because the Court must even in serious and dangerous situations judge crimes on a scale.  These crimes are serious and must be punished but Jayquan removed from the gangs is not a threat to the public and he has no intention of rejoining or reentering his past life again.  As stated, the Guidelines already account for Jayquan's violent acts but neither the Guidelines nor Probation consider any of the mitigating factors of Jayquan's involvement in the conspiracy.  All members of a conspiracy are not equal in their involvement and most respectfully, should not be treated equally under the eyes of the law.

In addition, once you look at the facts of Jayquan's life before and after the charged conduct these factors all are mitigating ones. Does Jayquan have a loving family, which desperately needs his assistance? Yes.  Has Jayquan maintained gainful employment in his life? Yes. Has

Honorable Alvin K. Hellerstein
January 9, 2023
Page 7 of 21

Jayquan developed a good reputation in his community? Yes.[3]  Has Jayquan been a positive
influence on many of those around him? Yes.  Has Jayquan tried to improve himself in jail
since his arrest by taking various vocational and educational courses? Yes.  Has Jayquan
participated and completed programs designed to help him not fall prey to negative
influences since his release? Yes.  Did Jayquan suffer through some traumatic events that led
to his involvement in the conspiracy? Yes.  Thus, the PSR's recommendation of a 17 year
sentence is misplaced and seems to have solely rested on a cold mathematical consideration
and has contrary to its statements otherwise not taken into consideration the details of the
instant offense, Jayquan's personal characteristics, the background of his criminal history
and familial history. Because none of those factors are aggravating factors and each one and
any other factor to be considered are each mitigating.

Jayquan is a young man who grew up in a dangerous community in abject poverty.  Yes, he
made grave mistakes as a young man that landed him in State prison for almost 3 years as
teenager.  But he served his time and when released from jail had been living the life that he
was supposed to and had wanted to.  He was with his family, working hard at various jobs
and most importantly not running in the streets and returning to his old life.  He was not
running around accumulating arrests, he was working, earning a paycheck with honest hard
labor.  Life was moving in the right direction for him.  He was well respected, employed and
with a wonderful woman.  The future seemed very bright.  Then the Covid crisis struck, which
had a disastrous effect on his life because it made it impossible for him to find work and he
had no savings, no cushion to fall back on.  And as stated he failed this test and returned to
his old life in an effort to make ends meet.   It is difficult sometimes for a person to see their
life tumbling out of control because emotional blinders blind their eyes.  Here it was the
nightmares of his youth and the threat of not being able to feed his own son or ultimately
provide a place to live.  He had no one to guide him back once he strayed from the right path.
No one he looked up to who could give him advice or help rescue him from his terrible
decisions.  His life took a horrible turn and led him to the streets and ultimately to his arrest
herein.  It took a rude shock to his system such as the arrest herein for those blinders to be

---

[3] See attached letters.

Honorable Alvin K. Hellerstein
January 9, 2023
Page 8 of 21

ripped off and for Jayquan to see how far he had drifted from his life plan.  But now his eyes are wide open and during his incarceration he has done all he could not only to prove to this Court that he has learned from his mistakes and can be trusted with a substantial below Guidelines sentence but to prove to himself that he can do it and he will do it.

I have gotten to know Jayquan very well over the many months I have represented him and I can tell you he is a very remorseful and determined man.  He is embarrassed by what he has done and wants nothing more than to demonstrate to this Court, his community, his family and himself that he is not the Jayquan who got involved in the charged conspiracy.  He is better than that.  He expects more from himself and he wants to pay his debt to society and return to being a positive influence on society and to his family members.  He wants to work, he wants to be with his family and he wants to teach his child the lessons of life so he do not make the same mistakes he did. He has learned the lesson that hard work and dedication to your family is the answer.  He is determined to leave criminal activity behind him and become a reputable and respected person in his community.  I have seen a lot of defendants in my 38 years as a criminal defense attorney and I have seen many who have professed to have learned this lesson and some have learned the lesson and some have not, but I truly believe that Jayquan has.  It has been burnt into his very soul so much so that he will not deviate from his desire to be there as a father to his son, a partner to his loving girlfriend, a son to his mother and brother to his family and positive member of society.  I truly believe that no Court will ever see Jayquan before it again as a criminal defendant.

Based on the above, the letters submitted by Jayquan and his friends and family this Court has a very difficult task, of deciding what is a just sentence in this matter both for society in general and Jayquan specifically.  However, it is respectfully suggested that a sentence of seven years followed by an extended term of supervised release fits the Court's mandate to "to impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," as stated in Kimbrough v. United States, 128 S.Ct 558, 571, 169 L.Ed 481 (2007). This phrase is euphemistically referred to as the "parsimony clause," it is in reality a manner of codifying the constitutional doctrine of the least restrictive alternative.  "Parsimony in the use of punishment is favored.  The sentence imposed should therefore be the least severe sanction necessary to achieve the purposes for which it is imposed ..." See, American Bar

Honorable Alvin K. Hellerstein
January 9, 2023
Page 9 of 21

Association, Standards For Criminal Justice, Chapter 18, "Sentencing Alternatives and Procedures", 18-3.2(a)(iii) (1993). Yes, this sentence is a below Guidelines sentence in this matter, but it is respectfully suggested that this sentence is warranted.

An extreme extended sentence such as suggested by Probation in this matter is unnecessary to teach Jayquan a lesson he has already learned. While prison time is always difficult. The prison time Jayquan has already been subjected to due to Covid restrictions has been much harsher, so much so that Courts throughout the nation are taking such realities into consideration when deciding on a just sentence.

It is respectfully submitted that the Guidelines themselves in this matter are overstated due to the fact that while technically the PSR and the plea agreement place him in the correct criminal history category of VI as a career criminal under U.S.S.G. §4B1.1(b) that this greatly overstates his criminal history category. U.S.S.G. § 4A1.3 authorizes a Court to reduce the criminal history of a defendant where the Court finds, "that a defendant's criminal history category significantly over represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." *Nichols v. United States*, 511 U.S. 738, 751-752, 114 S.Ct. 1921, 128 L.Ed. 745 (1994). Here, a review of the facts and the defendant's personal situation clearly demonstrates that the defendant's criminal history category should be reduced from VI to II. Jayquan is arrested twice in the span of a few months when he is only 16 years old. While the charges were serious in nature they are the only convictions that he has. Importantly on his first charges he was granted Youthful Offender treatment which means that he was told by the Court in that case that this conviction would not be used against him again to increase his penalty on any new charges, which is exactly the opposite what the Sentencing Guidelines require and Probation has recommended. Furthermore, the Court which originally sentenced Jayquan on these two very serious charges realized they were the acts of a very immature and troubled youth and chose even though it did not have to, to sentence Jayquan to concurrent sentences. In essence the Court therein chose to treat Jayquan's actions as one conviction and one sentence. Jayquan is now most respectfully asking this Court to do the same. Respect that Court's decision to grant him Youthful Offender status and treat Jayquan as if he has only one

Honorable Alvin K. Hellerstein
January 9, 2023
Page 10 of 21

conviction and one prison sentence.  That is what the Court therein did and we ask this Court to adopt the same ruling.

Thus, when Jayquan's criminal history is carefully reviewed it is evident that he should not be treated like a career criminal.  All his criminal history points result from two arrests which happened in a span of less than 6 months when he was 16 and 17 years old.  There is no doubt that using these two convictions to raise him to the level of a career criminal certainly overstates his criminal history and propensity and necessitates that this Court grant him a downward departure pursuant to USSG § 4A1.3.  Thus, the defense would respectfully submit that Jayquan's criminal history should be reduced from a Category VI to a Category II and the Guideline level the Court should begin its sentencing calculation from is 108 - 135 months.  The defense would further respectfully suggest that once the Court considers all of the facts of this case and Jayquan's personal history and actions since his arrest that he receives a sentence of seven years on Count 10 and a sentence of time served on Count 7. Probation does recommend a below Guideline sentence on Count 7 of 120 months but this recommendation would still result in a sentence of 17 years which would greatly exceed the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," as stated in <u>Kimbrough v. United States</u>, 128 S.Ct 558, 571, 169 L.Ed 481 (2007).

To further support this respectful request the Court is urged to consider that just as positive experiences can assist with healthy brain development, children's experiences with child maltreatment or other forms of toxic stress, such as domestic violence, extreme poverty or lack of positive role models can negatively affect brain development. (See, Understanding the Effects of Maltreatment on Brain Development, at https://www.childwelfare.gov.) Stress and maltreatment can have many negative effects on brain development which can result in an inability to react appropriately to stressors, increased adrenaline and cortisol levels and reduced volume in brain areas related to learning and memory. <u>Id.</u>  Maltreatment also affects behavioral, social and emotional functioning.   Chronic stress can produce a persistent fear response, hyperarousal, anxiety and depression, diminished executive functioning, weakened response to positive feedback, and a perception of threats even in safe environments which lead to aggressive behaviors. <u>Id. at 8-9</u>.  The effects of maltreatment

can continue to influence brain development and activity into adolescence and adulthood. Often, these youth have developed brains that focus on survival, at the expense of the more advanced thinking that happens in the brain's cortex. An underdeveloped cortex can lead to increased impulsive behavior, as well as difficulties with tasks that require higher-level thinking and feeling. These teens may show delays in school and in social skills as well. They may be more drawn to taking risks, and they may have more opportunities to experiment with drugs and crime if they live in environments that put them at increased risk for these behaviors. (Certainly Jayquan grew up in such an environment).  Maltreatment as a younger child can have longitudinal negative effects on brain development during adolescence. Jayquan has demonstrated difficulties in all the areas described above. He never received sufficient treatment to resolve those issues and traumas. He grew up in a highly impoverished area, was subjected to corporal punishment at home and was exposed to extreme violence and criminality in his neighborhood and was negatively influenced by older boys and men who were involved in crime. He lived under constant stress and toxicity. These factors impacted his brain development and influenced his later behavior; behavior that ultimately resulted in years of institutionalization and incarceration, rather than rehabilitation.

Unfortunately, Jayquan fits within this paradigm that shows that "[f]or many boys, the cumulative result of poverty, racial segregation, antisocial ethics, and fatherlessness is often crime." See, *United States v. Bannister*, 786 F. Supp. 2d 617, 642 (E.D.N.Y. 2011). "The lure of reliable, easy income through the sale of drugs is particularly appealing to many young men living in poverty." Id. at 643.  ". . . many [] children spend the bulk of their times on the streets . . . of a crime ridden, violence prone and poverty-stricken world. The image of success in this world is not that of the "solid citizen," . . . but rather the "hustler" who promotes his own interests . . . The dope sellers . . . are the "successful" men because their earnings far outstrip those [of] men who try to climb the economic ladder in honest ways. Young people . . . are acutely conscious of a system which appears to offer rewards to those who illegally exploit others, and failure to those who struggle under traditional responsibilities. *Id.* at 642 (quoting The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders 262 (Pantheon 1988).   Experience shows us that all too often young men who

grow up in high crime neighborhoods without a positive male role model, with little education, and saddled with emotional scars, make poor decisions and wind up as part of a sad statistic in the criminal justice system. Recent and not-so-recent studies confirm what we and undoubtedly the Court has witnessed in so many cases: young African American and Latino men suffer severe and far-ranging consequences by the absence of their father during their formative years.  For Jayquan, the lack of his father or presence of positive male role models in his formative years, certainly contributed to his struggles. The abandonment of his father had a life-altering impact on Jayquan and created a major void that has never been filled.  This effect also further exacerbated his fears of not being able to care for his child when the Covid crisis left unable to find work. Thus, most respectfully, it is requested that the Court take these respected studies and facts into consideration when sentencing Jayquan.  The Court should note that even if the Court grants the defendant's sentencing request by the time Jayquan is released from jail, he will have spent fully one third of his short life behind bars.  This is not a short-term incarceration that Jayquan has not learned from.  To the contrary, it is a long and extended term of punishment from which Jayquan has already learned many lessons and will continue to learn lessons and seek to improve himself through courses and his own private study in the many years he has left. And, when he is ultimately released, he will work every day to overcome his problems through legal and recognized means and also teach and advise his son and others to not follow in his footsteps of turning to the streets to solve life's problems.

Jayquan respectfully submits that a sentence of seven years with a lengthy supervised release period would be sufficient, but not greater than necessary, to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a).  Title 18 U.S.C. § 3553(a) requires sentencing judges to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the sentencing purposes of punishment, deterrence and rehabilitation. In determining the appropriate sentence, the court must first calculate the applicable sentencing Guideline range and then consider the relevant § 3553(a) factors, including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (4) to afford adequate deterrence to

Honorable Alvin K. Hellerstein
January 9, 2023
Page 13 of 21

criminal conduct; (5) to protect the public from further crimes of the defendant; (6) to provide the defendant with needed rehabilitative or other treatment; and (7) the need to avoid unwarranted disparities in sentencing. I have addressed the most relevant § 3553(a) factors below.

**1. & 2.  Jayquan's Background and the Nature and Circumstances of the Offense.**

The Court is referred to the attached letters by Jayquan and his friends and family for a glimpse into what type of person Jayquan is.  The letters paint a picture of young man who knows how to treat people.  Who is respected by his peers and who has been a positive influence on those who know him best.  Jayquan admittedly has a serious criminal past.  His actions occurred when he was very young and at a time when he was lacking direction in his life due to the death of his grandmother and the abandonment of his father throughout his life.   Jayquan lost his way as a very young teenager and became influenced by those in the streets around him and had not matured into the man he is now.   Jayquan certainly made some bad errors in judgment and character, but they came at a time in his life when he was not seeing life correctly.  He has proven that he can work consistently.  He has established and maintained a long-term relationship. He has tried to support his family.  Once released from custody he has no intention to returning to criminal conduct or life in the street.  He seeks to get a job and be there for his family.

Jayquan also understands the seriousness of his crimes and is remorseful for his actions. Jayquan understands the harm his actions and the similar actions of others have on communities such as his and others.  He wishes he could go back in time and stop himself from getting involved with such conduct.  But he can't, he can only do as he has done which is work every day to prove to everyone including this Court that he has put that life behind him.

**3. A Seven Year Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Protect the Public, and Deter Jayquan and Others.**

Jayquan understands the seriousness of the offense.  He knows what he did was a grave offense not only against the law but also against society.  He is truly remorseful for his actions and this experience is one that he does not wish to ever repeat.  Jayquan has proven to be a

Honorable Alvin K. Hellerstein
January 9, 2023
Page 14 of 21

man who earned the respect of his fellow citizens and has been there in times of need for those who have sought his help. Jayquan has not shirked from taking responsibility for his actions since the beginning of his case he has demonstrated remorse that I truly believe he feels. Jayquan has learned that criminal conduct was not the correct answer to what happened to him and society has nothing to fear from Jayquan going further.

A seven year sentence as respectfully requested cannot be deemed light or inconsequential by the public or the prosecution. It is an extended sentence more than twice the amount he has ever done and literally over one third of his life on this planet. It has and will continue to teach him the lesson that crime does not pay.

### 4. A Seven Year Sentence is Sufficient in This Instance to Afford Adequate Deterrence to Criminal Conduct.

Jayquan has as previously stated learned his lesson. Jayquan has certainly been affected by his arrest and never wants to go through this process again. He realizes that he cannot return to criminal conduct. He will stand before this Court on January 23rd a very scared and nervous man as this Court holds his future in it's hand because he realizes the consequences of this Court's decision and he never wants to be in that position again. If this Court decides that a seven year sentence is just in this matter Jayquan's reaction will most assuredly not be "oh I got away with one, I can do it again." To the contrary Jayquan's reaction will be one of overwhelming gratitude to this Court and that he never wants to be in the position of risking everything again. Jayquan most respectfully does not need a highly extended prison sentence to teach him a lesson. He has learnt the lesson already time again. The lesson was been made perfectly clear to him when officer's put cuffs on his wrists and took him to Court. It was driven into his brain when after his first court appearance he was hauled off to jail. It became clear to him when he first learned the criminal consequences for his actions. It was solidified as he has spent day after day, week after week, month after month and now year after year apart from his family and most importantly his young son. And, finally the lesson has been learnt as he has spent these last few weeks nervously awaiting the Court's pronouncement of his sentence. Jayquan has certainly been deterred from committing any crimes again. That lesson has been entrenched in his mind never to be forgotten.

§3553 (a) requires however a sentencing Court to consider not only specific deterrence but also general deterrence.  Above I have described the facts relative to specific deterrence and how this arrest and subsequent prosecution have seared into Jayquan's mind the quest to live a law-abiding life and to repay society for the harms he has caused.  However, I would add to those facts the analysis provided by some empirical studies that have been conducted by specialists in this area that support Jayson's ability to lead a law abiding life.  The studies have considered many factors in determining which defendants are most likely to become recidivists.  See, USSC, *Measuring  Recididivism* (2004).

The first factor considered is age.  The studies have demonstrated that recidivism declines dramatically with age.  While a person under 21 has a 35.5% chance of committing another crime, this percentage drops considerably to 9.5% for a person of Jayquan's age when he is ultimately released years from now.

The second factor considered is employment.  The studies have demonstrated that if a person has maintained stable employment in the past the recidivism rate drastically lowers.  Here, Jayquan has clearly demonstrated a history of employment.  Thus, this factor points to a low recidivist chance.

The third factor considered is how many previous criminal convictions does the defendant have.  The studies have found that those with 2 or more points have a 10.3% chance of recidivism. Here, while Jayquan does have criminal record it all arose in a span of less than 5 months when he was a young teenager.

The fourth factor considered is education. The studies have demonstrated that the more education one has the lower the chance of him or her becoming a recidivist.  While it is true that Jayquan did not graduate high school, he has taken vocational courses to improve himself and his chances of employment.  He has also started to take classes in order to receive his GED.  Jayquan certainly understands the value of an education and has consistently taken courses over the years to make himself better, smarter and more employable.  This would point to a lower recidivist chance.

The fifth factor is family.  The studies have observed that if a person is married and/or has close ties to his or her present family members the chance of recidivism is lowered.  Here,

Honorable Alvin K. Hellerstein
January 9, 2023
Page 16 of 21

Jayquan is very close with his family members and friends.  This would indicate that Jayquan is not regarded as a high risk to become a recidivist.

The sixth factor is absence of drug use.  The studies indicate that those who were not using drugs immediately prior to their arrest have a lower recidivist rate.  Here, while it is true that Jayquan was abusing Marijuana prior to his arrest and has at times abused other drugs he is certainly willing to attend any drug programs to help keep from returning to marijuana use.  Thus, this would point to a low recidivist rate.

The final factor is whether the offender is charged with a violent or non-violent crime.  Jayquan is obviously charged with violent crimes.  Thus, this would the only factor that would not indicate a lower recidivist rate.

Therefore, when all seven factors are considered in their entirety it is found that Jayquan fits in the lowest chances to recidivate in 6 of them.  Therefore, not only does his personal history demonstrate a low chance of recidivism on his part, the empirical studies conducted by the experts in the field indicate that he has a very low chance to commit new crimes upon his release from jail.

A Sentencing Court must also consider "general deterrence" when deciding a sentence.  Here again the experts have conducted many studies and they have routinely found that there is **no** empirical relationship between sentence length and specific or general deterrence.  In all categories of crime from white collar to drug offenses, from violent crimes to larcenies severe sentences have proven not to deter crime.  The studies have shown however that lengthy sentences do increase the rate of recidivism.  See, Lynne M. Vieraltis et. al., *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Pub.  Pol'y 589, 591-93 (2007), U.S. Sent'g Comm'n Staff Discussion Paper, *Sentencing Options under the Guidelines* 18-19 (Nov.1996), available at http://www.ussc.gov/SIMPLE/sentopt.htm, Miles D. Harer, *Do Guideline Sentences for Low Risk Drug Traffickers Achieve Their Stated Purposes?*, 7 Fed. Sent. Rep 22 (1994).

Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the scientific research shows no relationship between sentence length and deterrence.  The general research finding is that "deterrence works," in the sense that there

Honorable Alvin K. Hellerstein
January 9, 2023
Page 17 of 21

is less crime with a criminal justice system than there would be without one.  But the question for this Court is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime.  Here the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence. Current empirical research on general deterrence shows that while **certainty** of punishment has a deterrent effect, "increases in severity of punishments **do not** yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)

The fact that "general deterrence" is not considered by people considering committing crimes is best demonstrated by the studies of white-collar crimes.  For purposes of argument it can be rationally presumed that the white-collar criminal is the most rational of criminal offenders.  That if any criminal offenders were going to consider all of the pluses and minuses of committing a criminal act, a white collar criminal would be most likely to indulge in that type of thinking.  However, the studies show that there is no difference in the deterrence factor between probation and imprisonment for white-collar offenders. That is, offenders given terms of probation were no more or less likely to reoffend than those given prison sentences.  See, David Weisburd et.al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995).

This has proven to be true even in narcotics cases. In a study of drug offenders sentenced in the District of Columbia, researchers tracked over a thousand offenders whose sentences varied substantially in terms of prison and probation time.  Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, __ Criminology ___ (2009).  The results showed that variations in prison and probation time "have no detectable effect on rates of re-arrest." "Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame."  In other words,

Honorable Alvin K. Hellerstein
January 9, 2023
Page 18 of 21

"at least among those facing drug-related charges, incarceration and supervision seem not to deter subsequent criminal behavior." Id.

The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. Tonry, *Purposes and Functions of Sentencing*, *supra*, at 28-29.  A review of this issue concluded: "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

The Commission itself has found that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." See USSC, Measuring Recidivism at http://www.ussc.gov/publicat/Recidivism_General.pdf.  State law enforcement officials at the Commission's recent hearing confirmed the research results. The late Chief of the Miami Police Department, John Timoney testified that the deterrent effect of the federal system is not its high sentences but the certainty that there will be punishment.

The Courts also have taken into consideration the lack of effect of "general deterrence".  In United States v. Beiermann, 599 F. Supp. 2d 1087, 1103-04 (N.D. Iowa 2009) the Sentencing Court after reviewing empirical evidence regarding the continuing increase in the number of drug and child pornography offenders despite the war on each and stiff federal sentences, concluded that "there is not a sliver of evidence in this sentencing record remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet. . . . This does not mean that [the defendant] should not receive a lengthy sentence for his criminal conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any

Honorable Alvin K. Hellerstein
January 9, 2023
Page 19 of 21

empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."

Furthermore, a comprehensive 2014 review led by the National Research Council, concluded, that any deterrent effects of increased sentences are modest at best, and diminish, rather than increase, as sentence lengths increase. *See* Nat'l Res. Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, 154 (Jeremy Travis et al., eds. 2014). Citing previous NRC studies, the report also noted that ""insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects." And "[n]early every leading survey of the deterrence literature in the past three decades has reached the same conclusion" *Id.* at 90.

Finally, a very recent (2018), highly sophisticated study of over 300,000 individuals sentenced under the federal sentencing guidelines, which was co-authored by a team including former Research Directors of both the U.S. Sentencing Commission and the Federal Bureau of Prisons found that a 28 percent increase in prison time would reduce recidivism from a base rate of 20 percent to 19 percent —a 1 percent drop. "[O]ur sense is that the effect is not large, and that small differences in prison length of stay have a neutral effect on recidivism." See, William Rhodes, et al., Relationship Between Prison Length of Stay and Recidivism: A Study Using Regression Discontinuity and Instrumental Variables With Multiple Break Points, 17 Criminology & Pub Pol'y 731, 754 (2018).

Thus, this Court in considering what sentence Jayquan should receive for his conduct must of course consider "general deterrence" but based on the above studies it is respectfully submitted that this Court should consider "specific deterrence" to a greater degree than "general deterrence".

**5. A Seven Year Sentence is Sufficient in This Instance to Protect the Public From Further Crimes by Christian.**

Jayquan is truly remorseful for his actions and as previously stated has no intention of returning to criminal conduct upon his release from jail.

**6. A Seven Year Sentence is Sufficient in This Instance to Provide Jayquan With Needed Rehabilitative or Other Treatment.**

Honorable Alvin K. Hellerstein
January 9, 2023
Page 20 of 21

Jayquan is of course willing to participate in any programs the Court or Probation may deem necessary for him in the future.  His dedication to these programs is proven by his successful completion of numerous courses during his incarceration already.

**7.   A Sentence of Probation In This Matter Would Not Present The Court With Unwarranted Disparities In Sentencing.**

None of Jayquan's codefendant have been sentenced yet.  Although all of them seem to have substantially lower Guideline levels than him.

In <u>United States v. Howe</u>, 543 F.3d 128 (3d Cir. 2008) the Court found that a defendant's post conviction remorse is an adequate reason for a Sentencing Court to grant a defendant a below Guidelines sentence.  The Court further noted that the remorse need not be "exceptional".  <u>Howe</u> was a white-collar case, but I think any defendant can feel remorse for his actions.  Here, I think the record is clear that Jayquan feels extraordinary remorse for his actions.  This is evident by his conduct and his expressed thoughts to Counsel and the Court, which demonstrate his heartfelt remorse for his actions.  Thus, Jayquan's remorse is another factor this Court should consider in deciding whether to grant Jayquan a below Guidelines sentence.

The object of this letter and the attached letters is to give this Court some insight into how and why Jayquan finds himself before your Honor awaiting the pronouncement of sentence and what sentence given the varied sentencing options the Court has at its disposal best accomplishes the goals of a Sentencing Court.  It is the defendant's position that after considering all of the relevant factors of Jayquan's situation, the law as it is today and the empirical studies done in this area that a seven year sentence with a lengthy post release supervision period would be reasonable herein.  If in fact this Court grants such a sentence Jayquan would still obviously be under Court supervision for many years to come and the Court will know full well if the trust it has put in Jayquan was well placed and if it wasn't and Jayquan returns to this Court this Court will certainly be able to severely punish Jayquan for his actions.  But if it turns out that the trust this Court would be placing on Jayquan is found to be successful the reward to society in general and Jayquan and his family specifically

Honorable Alvin K. Hellerstein
January 9, 2023
Page 21 of 21

would be great.  The Court will know that Jayquan has kept his promise, been there for his family and begin fulfilling his potential.  This would be a great victory for how the judicial system is supposed to work. A demonstration that the system understands that all crimes are not equal and that the system can help someone who has even committed a serious crime like Jayquan has done get back on his feet, return to society and be a positive influence.  Such a sentence of seven years and years of supervised release would certainly meet the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," as stated in <u>Kimbrough v. United States</u>, 128 S.Ct 558, 571, 169 L.Ed 481 (2007).

The question of whether God prays is routinely discussed among philosophers and many have concluded that the answer is yes God does pray and the prayer is that it's penchant for mercy outweigh it's desire for punishment.  Here, the defense and all those related to Jayquan pray that this Court take into consideration the component of mercy over punishment due to the entire situation presented.

Thank you very much for your consideration of this matter.

Most Respectfully,

David Touger